JUDGE DANIELS



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEMPSEY PIPE & SUPPLY, INC.

      Petitioner,

-against-

T. Co. Metals, LLC

      Respondent.

Index No. 07 CIV 7749

---

### PETITION TO VACATE IN PART, MODIFY IN PART, AND CORRECT IN PART AN ARBITRATION AWARD, OR IN THE ALTERNATIVE TO CONFIRM THE AWARD

1. This Petition pursuant to Sections 10 and 11, and Chapter Two, of the Federal Arbitration Act ("FAA"), and the Convention on Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), seeks the following relief:

  First, Petitioner Dempsey Pipe & Supply Co. ("Dempsey") seeks to vacate and modify, in part, an Amended Final Award dated June 4, 2007 ("Amended Award," Ex. 1) because the Arbitrator exceeded his powers by correcting non-clerical, non-computational, non-typographical errors in the Original Final Award ("Original Award," Ex. 2), and by substantively changing his determination of damages based on those corrections.

  Second, Dempsey seeks to have the Court vacate and modify the Amended Award, in part, to correct what was in fact an evident material miscalculation of figures based on a clearly erroneous assumption of fact that is refuted by the record and by the

Arbitrator's own finding of fact, and was not a subject of any contention between the parties.

Third: As modified and corrected (or in its existing form if relief to modify and correct is denied), Dempsey seeks recognition and enforcement of the Amended Award.

**The Parties, Jurisdiction, and Venue**

2. Dempsey is a corporation organized and existing under the laws of the State of New York, with its offices at 80 Liberty Street, Bolivar, New York.

3. Respondent T. Co. Metals LLC ("T. Co.") is, upon information and belief, a New Jersey limited liability corporation having its principal place of business at P.O. Box 309, Princeton, New Jersey 08542.

4. Dempsey and T. Co. were parties to the arbitration of an international dispute within the meaning of the New York Convention and Section 202 of the FAA, as the matter concerned the purchase and sale of steel pipe manufactured in Chile and imported into the United States by T. Co. for re-sale to Dempsey. The parties' arbitration agreement provided for arbitration before a single arbitrator under the International Arbitration Rules of the American Arbitration Association ("AAA").

5. This Court has subject-matter jurisdiction pursuant to Section 203 of the FAA, as this is a matter than falls under the New York Convention.

6. In the alternative, to the extent that subject-matter jurisdiction based on the New York Convention might be contested, this Court has subject-matter jurisdiction on the basis of diversity of citizenship, 28 U.S.C. §1332(a). The matter in controversy exceeds $75,000 exclusive of interest and costs.

7. Venue is proper in this Court under 9 U.S.C. § 204, as the arbitration between the parties was held in New York City pursuant to an arbitration agreement that provided for arbitration to be held in New York City. In the alternative, if subject-matter jurisdiction is based on diversity, venue is proper in this District under 28 U.S.C. § 1391(a)(2), as the arbitration took place in New York City, and the Original Award and Amended Award were made in New York City.

## I. BACKGROUND FACTS

8. Dempsey contracted with T. Co. in early 2005 to purchase steel pipe manufactured in Chile, meeting certain industry standards and specifications, notably that the pipe would be ASTM A53-02 Grade B pipe, 6" diameter, in 20-foot lengths, and, insofar as relevant to this proceeding, with a .250" wall thickness (referred to in the Awards, and in this Petition, as "Subject Pipe"). Each of the two sales contracts provided that the pipe would be straight, within a tolerance of .25" over the 20-foot length.

9. Each of the two written sales contracts provided for disputes to be resolved by arbitration in New York under the International Arbitration Rules of the AAA.

10. Most if not all of the Subject Pipe delivered to Dempsey was non-conforming. Dempsey contended that there was a 100% percent defect rate; the Arbitrator held that the defect rate was 80%. The pipe was bowed beyond the straightness tolerance in the contracts. Many pieces were also severely bent.

11. Due to market conditions, Dempsey accepted most of the defective pipe, and bore the extra cost of processing the defective pipe, straightening the pipe as best it could. Dempsey paid T. Co.'s invoices up to a certain point. In all, Dempsey paid approximately $1.65 million out of approximately $2 million of T. Co. invoices. When

3

the parties could not resolve the question of compensation to Dempsey, and Dempsey declined to pay further, T. Co. commenced the arbitration in June 2006 seeking an award in the amount of the unpaid invoices. Dempsey asserted counterclaims for damages resulting from delivery of non-conforming goods.

12. The sales contracts provided that New York law applied. The arbitration proceeded on the basis that the law applicable to determine the rights and obligations of the parties was found in Article Two of the Uniform Commercial Code ("UCC"). In particular, the measure of damages for a buyer who had accepted non-conforming goods was governed by Section 2-714(2) of the UCC, which provides for damages measured by the difference, at the time and place of acceptance, between the value of the goods delivered (i.e. the non-conforming goods) and the value of the goods had they been as warranted. Dempsey also claimed incidental damages under the UCC, including its extra processing costs for the defective pipe.

13. The AAA assigned the case to be administered by its International Centre for Dispute Resolution ("ICDR"), and the case proceeded before a Sole Arbitrator under the AAA's International Arbitration Rules ("ICDR Rules").

14. After receiving extensive written and oral submissions of evidence and legal arguments, the Arbitrator issued the Original Award (Ex. 2) on April 20, 2007.

15. Following the Original Award, both parties petitioned the Arbitrator under ICDR Rule 30.1 to correct alleged errors in the Award. Dempsey submitted that a computational error had been made in calculating Dempsey's costs for processing the defective pipe. T. Co. submitted that the Award contained a number of "clerical errors."

16.   In an Order dated May 30, 2007 ("May 30 Order," Ex. 3), the Arbitrator (i) rejected Dempsey's claim to correct computational error, and (ii) accepted certain of T. Co.'s contentions that there were "clerical errors"; re-evaluated the evidence concerning the value of the Subject Pipe as warranted; reduced that value from $1000 to $950 per short ton; and reduced the diminution-in-value damages awarded to Dempsey from $420,537 to $340,587. The Amended Award, reflecting these changes, was issued on June 4, 2007.

## II. THE ARBITRATOR'S CORRECTION OF "CLERICAL ERRORS" IN THE ORIGINAL FINAL AWARD, CONCERNING THE FAIR MARKET VALUE OF THE SUBJECT PIPE AS WARRANTED

### Description of the Proceedings

17.   In the Original Award, the Arbitrator rejected T. Co.'s argument that the best evidence of the value of the subject pipe as warranted was the contract price of $780 per ton, holding that *"the Contract Price is not a reliable indicator of the value of the pipe had it been as warranted."* (Ex. 2 at 28, ¶ 114). The reason for this, found in the record, was the prices for foreign-made pipe, under contracts with long lead times for delivery, while considerably lower than domestic mill prices, were not available for purchases with near-term delivery.

18.   T. Co. also argued, in the alternative, that the average price Dempsey obtained for the Subject Pipe, after its efforts to straighten the pipe, was good evidence of the value of the Subject Pipe had it been as warranted. But the Arbitrator accepted Dempsey's evidence that it could not represent to its customers that the straightened pipe met the specifications of Subject Pipe, and that it therefore sold the pipe for less than if it been as warranted. (Id. at 28, ¶ 115).

19.   The Arbitrator then considered *"two types of evidence"* of the value of Subject Pipe as warranted. (Id. at 129, ¶ 116 ): First, there was evidence of *"the price at which the Subject Pipe*

*was being sold by market actors who would normally supply to an entity such as Dempsey.*" (Id. at 129, ¶ 117). The evidence in this category consisted of (i) price announcements from a domestic steel mill, Wheatland Tube, in a range over several months increasing from $1028 to $1148 per ton, (ii) invoices/purchase orders from a company that purchased Subject Pipe from Wheatland Tube, Stritt & Priebe, from $1116 to $1239 per ton, and (iii) eight invoices/purchase orders of a Dempsey competitor, Morris, on which all transactions were for purchases of steel pipe from foreign sources at prices ranging from $700 to $769 per short ton -- but the Arbitrator, misreading an entry on one of the Morris invoices, mis-interpreted the price to be $904 per ton (the entry on the invoice was $769 per ton, but was misread as $769 per hundred feet, which converted to $904 per ton). On the basis of this evidence, the Arbitrator concluded that the value of the Subject Pipe as warranted was $1000 per ton. (Id.).

20.    The second type of evidence of the value of Subject Pipe as warranted was "*the price at which Subject Pipe was being sold by market actors who are at the same level in the distribution chain as Dempsey.*" (Id. at 30, ¶ 118). This included invoices of four companies: HOW, Morris, Dempsey Steel Pipe Co. (a different Dempsey company owned by a cousin) and Stritt & Priebe. Based on this evidence, the Arbitrator concluded that "*market actors at the same level in the distribution chain as Dempsey were reselling Subject Pipe in the fall of 2005 at approximately $1250 per ton. Removing a mark-up for overhead and profit of 25%, the Arbitrator finds that the fair market value of the Subject Pipe in the fall of 2005 was approximately $1000 per ton. This is corroborative of the result in the above paragraph.*" (Id.)

### "Clerical" Correction of One Morris Industries Invoice Price

21.    T. Co.'s Petition to Correct the Award contended it was "clerical error" for the Arbitrator to have stated that the upper end of the range of Morris invoices, for purchase of pipe, was $904

6

per ton, when in fact the price recorded as $904 per ton was $769 per ton. In the May 30 Order (Ex. 3 at 7, ¶ 29), the Arbitrator agreed: *"The unit in this invoice is obscured by handwriting on the invoice, and the Arbitrator understood that the price was $769 per 100 feed (CF), which converts to $904 per short ton."* The Arbitrator went on to say (*id.* at ¶ 30):

> The reference to $904 can therefore be considered a "clerical, typographical or computation error" within the meaning of Article 30 of the ICDR International Rules. By consequence, the reference in the Award to the range of Morris prices. . . should be "between $700 and $769 per short ton", not "between $700 and $904 per short ton". The Arbitrator hereby amends paragraph 117 of the Award to correct this clerical error *pertaining to one of the ten sets of data relied upon by the Arbitrator in establishing the value of the pipe as warranted.*

(emphasis supplied).[1]

### "Clerical" Correction to Exclude HOW Invoice for 10-foot Subject Pipe

22. T. Co. argued that the Arbitrator committed a "clerical" error by assigning probative value to an invoice of a company called HOW for sale of Subject Pipe in 10-foot, not 20-foot, lengths. (There was evidence that 10-foot sections are produced by companies like Dempsey, by cutting standard sized 20-foot pieces in half). Nothing in the Original Award mis-described the invoice, or indicated that the Arbitrator had mis-interpreted the invoice. Nevertheless, the Arbitrator agreed with T. Co., and stated in the May 30 Order (at ,¶):

---

[1] The text of ¶ 117 of the Original Award indicates the Arbitrator made a <u>judgmental</u> (and non-correctible) error by finding that these Morris invoices involved purchases of steel pipe from a domestic mill like Wheatland. He stated: *"Dempsey argues that these figures should be excluded because there is no information about the circumstances in which the Morris purchases were concluded."* But that was not Dempsey's position. The circumstances of the purchases were well-established: Morris's purchases, like Dempsey's from T. Co., involved foreign-made steel pipe, contracted well in advance of expected delivery date. Morris's foreign pipe contract prices were not probative of market value for the same reasons the Arbitrator found Dempsey's contract prices with T. Co. to be not probative. Thus, the Arbitrator's conclusion that *"the Morris prices are relevant for the purpose of comparison with the prices obtained by much smaller market actors,"* (id.) implies that the Arbitrator mistakenly thought the Morris prices were for domestic mill pipe, and thus meaningfully comparable to the Stritt & Priebe's purchases from Wheatland Tube.

7

T. Co. correctly notes that the Arbitrator considered a HOW invoice dated 16 July 2005 which related to the sale of 6 inch, 0.250 wall, <u>ten</u> foor pipe, rather than 6 inch, 0.250 wall, <u>twenty</u> foot pipe. The inclusion of the HOW invoice dated 16 July 2005 in the Arbitrator's consideration of pricing on twenty foot pipe, was a "clerical, typographical or computation error" within the meaning of Article 30 of the ICDR International Rules. Thus, of the ten sets of [evidence] summarized in paragraph 21 above, the 16 July 2005 HOW invoice should be excluded. . . .

### "Clerical" Correction to Exclude Invoices for Sale of Threaded & Coupled Pipe

23.    T. Co. also claimed clerical error as to two invoices for sales of "threaded and coupled" pipe, not plain-end pipe. (Threading and coupling is a processing service of companies like Dempsey; pipe purchased from mills has "plain" ends). Nothing on the face of the Original Award mis-described the invoices, or indicated that the Arbitrator mis-construed them. Nevertheless, the Arbitrator agreed, and stated in the May 30 Order (Ex. 3 at 9, ¶ 42) :

> The Arbitrator sought to exclude from consideration all invoices which included the cost of threading and coupling, and it was a clerical error not to exclude the 1 August HOW invoice and the 5 November 2005 Demspey Pipe & Steel invoice, or, alternatively, to include them without making a downward adjustment for the cost of threading and coupling. The Arbitrator agrees with T. Co. that a downward adjustment of the 1 August HOW invoice and the 5 November 2005 Dempsey Pipe & Steel invoice was merited.

The Arbitrator went on to hold that a downward adjustment of the prices should enter into his consideration of them, although the amount of any such adjustment could not be determined because it could not be assumed that those companies' processing costs were the same as Dempsey's. The Arbitrator accepted T. Co.'s position that Dempsey's such costs were $70/ton (May 30 Order at 9, ¶ 43) – a finding of fact that is relevant to Dempsey's claim for correction of computation error in the Award, *infra*.

## Revision of the Award to Reduce Demspey's Damages By 30%

24. Based upon the above-described corrections of "clerical" errors, the Arbitrator held that the fair market value of the Subject Pipe should be $950 per ton, not $1000 per ton, and as a consequence the calculation of Dempsey's damages for diminished market value should be changed. In this respect, the Arbitrator stated in the May 30 Order (Ex. 3 at 12, ¶ 57):

> While the consequences of these four corrections is not a mere computational issue, and necessarily involves the same appreciation of the evidence before the Arbitrator on the issue of value as was conducted pre-Award, the Arbitrator believes that he has the power under Article 30 of the ICDR International Rules to reach conclusions derived from correction of clerical errors. Article 30 of the ICDR International Rules does not say that errors subject to correction must be set out in an award's conclusions. It is therefore to be understood that an arbitrator is empowered to change conclusions based upon clerical errors in the body of an award, even where such correction process entails an exercise of judgment beyond rote computation. The Arbitrator accordingly hereby determines that, but for the above-identified clerical errors, the Arbitrator would have found that the value of the pipe as warranted was $950 per short ton rather than $1000 per short ton. Paragraphs 117, 118 and 119 of the Award are hereby correspondingly corrected.

25. The Amended Award reflects these changes. (Ex. 1 at ¶¶ 128, 129, 146, 170).

26. None of the errors corrected by the Arbitrator were clerical, typographical or computational. They did not appear on the face of the Original Award, and could not be ascertained as errors without reference to the record and inquiry to the Arbitrator about his interpretation of the evidence and his intentions. The errors corrected by the Arbitrator were judgmental and interpretive errors, not clerical errors, and as such the Arbitrator lacked power to correct them under ICDR Rule 30.1.

27. In any event, the Arbitrator had no power to use the occasion of correction of these errors as a basis to re-balance the entire body of evidence and alter his ultimate conclusion concerning the fair market value of the Subject Pipe as warranted, and to reduce the damages awarded to Dempsey as a result.

### Dempsey's Request for Relief With Respect to the Arbitrator's Correction of Clerical Errors

28. By reason of the foregoing, the Amended Award should be set aside and modified in part: at minimum to restore the award of diminished market value damages to the sum stated in the Original Award, $420,537, and to restore the Original Award's finding that the value of the Subject Pipe as warranted was $1000 per short ton; and, additionally, to restore the Arbitrator's findings in the Original Award with respect to each of the corrections in the May 30 Order and Amended Award.

### III. THE ARBITRATOR'S EVIDENT MATERIAL MISCALCULATION OF DEMPSEY'S PROCESSING COSTS FOR THE DEFECTIVE PIPE

#### The Proceedings

29. The Arbitrator miscalculated Dempsey's costs to process the defective pipe in the Original Award. This occurred because the Arbitrator, having once correctly determined, in a Pre-Award submission to the parties (Ex. 4), that Dempsey's "shop rate" for processing of $125/hour pertained to the output of one machine, then applied that rate to the output of four machines, causing a 75% reduction in calculated processing costs. As a result, Dempsey's processing costs damages were only $48,513 when they should have been four times that amount, and (ii)

diminution-in-value damages under UCC 2-714(2) were understated by $91 per ton, because the Arbitrator used the incorrectly calculated processing costs figure to determine the fair market value of the Subject Pipe in defective condition.

### The Arbitrator's Pre-Award Submission Findings

30. In the Pre-Award Submission, the Arbitrator asked the parties if there were any reasons he should not find, *inter alia*, that *"Dempsey normally processes 12 pipes an hour, at a cost of $125/hour"*, and that Dempsey was only able to process the defective pipe at one-fourth of that efficiency, *i.e.*, three pipes per hour. (Ex. 4). Dempsey's written evidence, cited by the Arbitrator, stated clearly that 12 pipes per hour was the normal production rate on one machine, and three pipes per hour the rate for processing defective pipe on one machine.

31. Based on these findings, the Arbitrator calculated in the Pre-Award Submission that, assuming 70% of 2090 tons of pipe was defective, it took Dempsey <u>3,159.1 hours</u> to process the defective pipe, whereas Dempsey would have processed the same volume of non-defective pipe in <u>789.8 hours</u>. Multiplying the incremental processing hours, 2369.3 times the hourly rate of $125, the Arbitrator calculated incremental processing costs damages, of $296,169 (at 70% defect rate) -- and $421,375 if a 100% defect rate were found.

32. Thus, a finding that the $125/hour "shop rate" was a rate <u>per machine hour</u> was instrumental in the calculation.

### The Final Oral Hearing on March 19, 2007

33. At the final hearing on March 19, 2007, Dempsey confirmed that the Arbitrator's calculations of processing costs damages were correct. Dempsey urged the Arbitrtator to find that Dempsey's

processing costs damages were $421,375, as calculated by the Arbitrator in the Pre-Award Submission on the basis of a 100% defect rate.

34. At the Final Hearing, T. Co. offered no contention that the shop rate of $125/hour covered more than the output of one machine. T. Co. argued for a finding of fact that Demspey's productive capacity was diminished less than the 75% claimed. It argument was based on a logically flawed construct: that, if the number of additional hours calculated by the Arbitrator had indeed been required, the processing work would still be unfinished -- and since the work was indeed finished, Dempsey's diminished rate of productivity must have been far less than 75%.

35. Dempsey exposed the flaw in this argument with a simple answer: It had four machines, not one.

### The Original Award

36. The Arbitrator agreed with Dempsey, and found in the Original Final Award that the processing work was done utilizing all four machines (each having the same normal capacity of 12 pieces per hour and the same diminished capacity with regard to the subject pipe of 3 pieces per hour), for total hourly production of 12 pieces per hour. (Ex. 2 at 33, ¶ 127).

37. On this basis, the Arbitrator calculated that the total number of hours required to process the defective pipe – found to be 80 percent of the pipe delivered – was 784 hours, and the total cost (at $82.50 per hour, deducting profit element from $125/hour rate) was $64,680. (Id., ¶ 128).

38. The evident flaw in this calculation was that it necessarily assumed that $125/hour was the rate to process 48 defective pieces per hour not 12, i.e. that it was the rate per hour charged to customers for operating four machines, not one. The Original Award makes no such finding expressly; in fact the issue is not even mentioned. The assumption however is embedded in the calculation.

### Rejection of Dempsey's Application in the May 30 Order

39. The Arbitrator, rejecting Dempsey's application to correct the Award, stated with respect to the issue of whether the $125/hour rate was Dempsey's charge for running one machine or four machines, stated: *"This issue was not clearly presented during the proceedings, and there was no evidence on the record that the Dempsey shop rate of $82.50 per hour was a per machine hour price, rather than a per actual hour price."* (Ex. 3 at 3, ¶ 12).

40. This statement conflicts with the Arbitrator's statement in the Pre-Award Submission that *"Dempsey normally processes 12 pipes an hour, at a cost of $125/hour"*, a finding based on Dempsey's written evidence. There was no contention by T. Co. that Dempsey's evidence did not support the finding that the $125/hour rate was a per machine hour price. And there was no evidence in the record that the $125/hour rate <u>was not</u> a per machine hour price.

41. Indeed, a new finding of fact made by the Arbitrator in the May 30 Order confirms, based on the evidence, that $125/hour was a per machine hour price. Specifically, Dempsey's sales records, showing prices of pipe sold with plain ends and prices of pipe sold with threaded and coupled ends, were cited by T. Co. as evidence that Dempsey's charges for threading and coupling were on average $70 per ton. The Arbitrator accepted this. (Ex. 3 at 9, ¶43). As the Arbitrator held that each Dempsey machine could process <u>two tons per hour</u> of normal non-defective pipe, the $70/ton figure implies an hourly charge, for processing the output of one machine, of $140, and this excludes the possibility that the hourly charge for the output of one machine was 25% of $125, i.e. $31.25 per hour (which would correspond to $15.62 per ton).

42. In opposing the Dempsey's correction application, T. Co. offered no argument or evidence that the Arbitrator's calculation was correct in assuming that the Dempsey shop rate covered the

output of four machines. T. Co. opposed Dempsey's correction application on the ground that the Arbitrator should reconsider and reverse his findings that (i) four machines, not one, had been involved in the processing, and (ii) productive capacity had been diminished 75%, not a smaller amount. The Arbitrator, in the May 30 Order, while acknowledging that he lacked power to reconsider findings of fact, considered these argument sufficiently relevant to deserve attention:

> Had the arguments made by the Parties in their post-Award submissions been presented pre-Award, the Arbitrator would likely have found that at least 80% of the T. Co. supplied pipe was processed not on four machines but on a single machine at Dempsey's Hooksett facility. This finding would have necessitated reconsideration of Dempsey's evidence as to its additional processing costs, and would likely have resulted in a reduction of the $48,518 award to Dempsey as compensation for the additional cost of processing the non-conforming pipe.

(Ex. 3 at 3, ¶ 13).

44. In fact, T. Co.'s argument that 80% of the processing took place on one machine, in New Hampshire, was not a new argument post-Award; it had been clearly presented in the Final Oral Hearing on March 19, 2007. The argument had been based not on evidence of the location where processing work was done, but only that 80% of the defective pipe allegedly had been initially delivered to the New Hampshire plant. The Arbitrator, in finding that four machines had been used, at Dempsey's two facilities, had already heard T. Co.'s argument.[2]

---

[2] Because reconsideration was clearly improper, Dempsey did not, in responding to T. Co.'s opposition to the correction application, refer to the evidence in the record on the question of where the processing work had taken place. Had it done so, it would have referred, *inter alia*, to Dempsey's evidence that the most severely bowed and bent pipe delivered to New Hampshire was not able to be processed there because the machine could not tolerate the stress, and this pipe, about 25% of what was delivered in New Hampshire, was set aside and later trans-shipped to Dempsey's New York facility for processing.

## Correction of the Arbitrator's Calculation and The Consequences

45. The correct calculation of Dempsey's processing costs, correcting only the Arbitrator's error in applying the $82.50 rate ($125, adjusted to exclude any profit element in the charge to customers) to the hourly output of four machines instead of one, is as follows:

    9406 pieces of pipe /12 pieces per hour (on four machines) = 784 hours x 82.50 per hour per machine x 4 machines = $258,720.

46. The correct calculation of Dempsey's processing costs damages is $258,720 x .75 = $194,040, based on the Arbitrator's finding that conforming pipe would be processed in one-fourth of the time it took to process the non-conforming pipe.

47. The Arbitrator, in ascertaining the value of the non-conforming pipe, deducted the incremental processing costs per ton from the value otherwise calculated. But had the calculation been made correctly, the deduction would have been $121 per ton ($194,040/1599 tons), not $30 per ton. (Ex. 1 at 36, ¶ 142).

48. The Arbitrator further calculated the value of the non-conforming pipe by taking the price at which some of the non-conforming pipe had been sold to Morris by T. Co. in Spring 2006, and discounting that value by the amount necessary to equate the result with the calculation of value based on Dempsey's sales prices and processing costs. (Id., ¶¶ 143-145). Based on the corrected calculation of processing costs, the discount to the Morris price of $40 per ton, $10 per ton more than the processing costs per ton, should have been $102 per ton, to reconcile the Morris price with the calculation of processing costs.

49. On this basis, the corrected value of the non-conforming pipe was $675 per ton ($777-102); the diminution in value should have been $325 per ton ($1000-675), and the diminution of value damages should have been $325/ton x 1599 tons = $519,675.

### Relief Requested With Respect to Miscalculation of Processing Costs in the Amended Final Award

50. Based upon the foregoing, Dempsey requests that the Court, acting pursuant to Section 11(a) of the Federal Arbitration Act, applicable to this case pursuant to 9 U.S.C. § 208, correct the calculation made in ¶ 139 of the Amended Final Award, to arrive at a cost of processing the defective pipe of $258,720, and to make further conforming corrections in accordance with the mark-up annexed as Exhibit 5.

WHEREFORE Petitioner demands judgment

1. Vacating and modifying the Amended Final Award in part, as requested in paragraph 28 of this Petition, to reinstate the Arbitrator's conclusions in the Original Final Award with respect to the fair market value of the Subject Pipe as warranted, with corresponding impact on calculation of damages.

2. Correcting the Amended Final Award in part, as requested in paragraphs 45-50 of this Petition, to effectuate the changes reflected in Exhibit 5 hereto.

3. In the alternative to each of the foregoing, if Dempsey is denied all such relief, enforcing the Amended Award in accordance with the New York Convention and Chapter Two of the FAA.

4. For such other and further relief as the Court may deem just and proper in the circumstances.

Dated: New York, New York

    August 30, 2007

MARC J. GOLDSTEIN LAW OFFICES AND ARBITRATION CHAMBERS

By: _____/s/ Marc J. Goldstein_____

Marc J. Goldstein (MG-8701)

1230 Avenue of the Americas, 7th Floor

New York, New York 10020

(212) 799-8605

Attorneys for Petitioner Dempsey Pipe & Supply, Inc.