UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEMPSEY PIPE & SUPPLY, INC.

                 Petitioner,

-against-

                                        Index No. 07 CV 7749 (PAC)

T. CO. METALS, LLC

                 Respondent.

---

In the Matter of Arbitration Between

T. CO. METALS LLC,

                 Petitioner/Plaintiff,

v.

                                        Index No. 07 CV 7747 (PAC)

DEMPSEY PIPE & SUPPLY, INC.,

                 Respondent/Defendant.

---

**MEMORANDUM OF DEMPSEY PIPE & SUPPLY, INC. IN SUPPORT OF ITS
MOTION TO VACATE, MODIFY AND CORRECT IN PART AN ARBITRATION
AWARD, AND IN OPPOSITION TO T. CO. METALS LLC'S PETITION TO
VACATE THE AWARD**

MARC J. GOLDSTEIN LAW OFFICES

AND ARBITRATION CHAMBERS

1230 Avenue of the Americas, 7th Floor

New York, New York 10020

(212) 799-8605

Attorney for Dempsey Pipe & Supply, Inc.

## **Table of Contents**

Preliminary Statement                                                                1

STATEMENT OF FACTS                                                                   4

   A.  Nature of the Case                                               4

   B.  Material Findings in the Original Final Award                    4

   C.  The Arbitrator's Correction of Ostensible "Clerical" Errors      6

     (1) The Mis-Read Purchase Order of a Dempsey Competitor     6

     (2) The Correctly-Reported Invoice of HOW Industries for
10-Foot Pipe Sections                                                                7

     (3) The HOW and Dempsey Steel Invoices for Resale of
"Threaded and Coupled" Pipe                                                          9

     (4) The Arbitrator's Re-Determination of the Fair Market Value
of Conforming Goods                                                                 10

   D.  The Arbitrator's Miscalculation of Dempsey's Costs to Straighten the Pipe      10

ARGUMENT                                                                            14

POINT ONE – IN REDUCING THE AWARD, THE ARBITRATOR
EXCEEDED HIS POWERS                                                                 15

POINT TWO – THE ARBITRATOR MADE AN EVIDENT MATERIAL
MISCALCULATION OF DEMPSEY'S PROCESSING COSTS
FOR THE DEFECTIVE PIPE                                                              20

POINT THREE – THE ARBITRATOR DID NOT MANIFESTLY
DISREGARD THE LAW                                                                   25

CONCLUSION                                                                          27

**MEMORANDUM OF DEMPSEY PIPE & SUPPLY, INC. IN SUPPORT OF ITS MOTION TO VACATE, MODIFY AND CORRECT IN PART AN ARBITRATION AWARD, AND IN OPPOSITION TO T. CO. METALS LLC'S PETITION TO VACATE THE AWARD**

Dempsey Pipe & Supply Co., Inc. ("Dempsey") submits this memorandum in support of Dempsey's petition

(i) to vacate in part and modify in part the Amended Final Award delivered in an international arbitration in New York, on the ground that the amendments changed arbitral findings that were final and unreviewable,

(ii) to correct the Amended Final Award, to rectify a material error in mathematical computation; and

(iii) to confirm the Amended Final Award, as modified and corrected, and if not so modified and corrected, as is.

Dempsey also submits this memorandum in opposition to the petition of T. Co. Metals, LLC ("T. Co.") to vacate the Amended Final Award on grounds of manifest disregard of the law by the arbitrator.

## Preliminary Statement

The International Arbitration Rules of the American Arbitration Association ("AAA International Rules") permit arbitrators to correct certain types of errors made in a final award, but not others: mistakes that are clerical, typographical, or computational may be corrected, but mistakes of judgment, interpretation, or understanding are not correctible. Article 30.1 of the

AAA International Rules[1] promotes finality, sometimes at the expense of perfect adjudication. That is a balance the AAA, and other institutions administering international arbitrations, have struck, and that parties accept when they agree to arbitrate disputes under AAA International Rules, as did the parties here.

In this case, the arbitrator stretched the concept of "clerical error" beyond its limits, to address non-clerical errors in the interpretation of certain evidence that had been made in the Original Final Award. (Dempsey Petition, Ex. 2, hereinafter "OFA"). The arbitrator then went even further beyond "clerical error," to re-assess his overall subjective assessment of a large body of evidence, of which the re-interpreted items were a small part. On this basis, the arbitrator delivered an Amended Final Award (Dempsey Pet., Ex. 1, hereinafter "AFA") that reduced the money damages awarded to Dempsey for the diminution in value of non-conforming goods by nearly 20 percent from the sum awarded in the Original Final Award.

By doing so, the arbitrator exceeded his powers – as he lacked jurisdiction under the AAA International Rules to correct mis-interpretations of evidence, or to change his subjective judgments made in the Original Final Award. The Federal Arbitration Act ("FAA") confers authority on the U.S. District Court for the district in which the arbitration was held to vacate the award on the ground that the arbitrator exceeded the arbitrator's powers.[2]

---

[1] "Within 30 days after receipt of an award, any party, with notice to the other parties, may request the tribunal to interpret the award or correct any clerical, typographical or computation errors. . . ."

[2] This case arises under Chapter 2 of the FAA, 9 USC 201 et seq. implementing the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). Under Section 216 of the FAA, provisions of Chapter 1 that are not in conflict with Chapter 2 are applicable in cases governed by Chapter 2.

The arbitrator here also refused to correct a mathematical error that Article 30 of the AAA International Rules clearly permitted the arbitrator to correct. Indeed, the arbitrator made other findings of fact that confirm, to a mathematical certainty, that there was a mathematical error. Yet the arbitrator – who had correctly made the relevant calculation in a pre-Award written submission to the parties (Dempsey Pet. Ex. 4) – refused to correct the error and, as justification for that refusal, referred to alternative grounds for reaching a result even less favorable to Dempsey. Such reconsideration is also beyond the scope of the AAA International Rules, which do not provide for reconsideration on any ground. The FAA confers power on the District Court to remedy the situation: the power to correct material mathematical errors, and to vacate the award where an arbitrator exceeds his powers (as occurs when an arbitrator reconsiders matters already decided in an original Final Award).

****

T. Co.'s petition rests on an entirely different footing. T. Co. claims that the award of any money damages to Dempsey for the diminished market value of non-conforming goods, under Article 2 of the Uniform Commercial Code (UCC), was "manifest disregard of the law." The law that T. Co. says was disregarded is not a provision of the UCC, nor another statute or a common law principle, but a provision in the parties' sales contracts that excluded the recovery of consequential damages. But neither the sales contracts nor the UCC clearly defined consequential damages as including the diminished market value of non-conforming goods accepted by a buyer in a commercial transaction. T. Co. equates such diminution of value damages with "lost profits," but neither the contracts nor the law compelled that equation. Accordingly, T. Co.'s petition is seriously lacking in merit.

## STATEMENT OF FACTS

### A. Nature of the Case

This was a breach of warranty case involving the delivery and acceptance of non-conforming goods, here carbon steel pipe imported by T. Co. from Chile and re-sold to Dempsey in early 2005. The contracts provided that they would be governed by New York law, and that disputes would be resolved under AAA International Rules.

### B. Material Findings in the Original Final Award

The arbitrator found that 80% of the pipe delivered to and accepted by Dempsey was non-conforming (OFA ¶¶ 106-107), and also found that the limited remedies in the sales contracts providing for replacement of defective goods or, at the seller's sole discretion, a reduction in price, failed of their essential purpose (OFA ¶¶ 84-97), such that Dempsey was entitled to damages as provided in Article 2 of the UCC -- and in particular Section 2-714(2) governing diminution in market value and 2-715(1) governing incidental damages.

Section 2-714(2) provides that the buyer who has accepted non-conforming goods may recover damages measured by the difference, at the time and place of acceptance, between the value of conforming goods (i.e. "as warranted") and the value of the non-conforming goods (i.e. "as accepted"). In the Original Final Award, the arbitrator listed ten different items of evidence that he considered in reaching his conclusion that the fair market value of conforming goods was $1000 per ton. (OFA ¶¶ 117-119). In his Order determining the parties' respective post-Award applications (Dempsey Pet., Ex. 3, hereinafter, the "Order"), which is effectively part of the

4

Amended Final Award, the arbitrator stated that these ten items of evidence were listed in the Original Final Award from highest to lowest in the order of their probative value as determined by the arbitrator. (Id. ¶¶ 21-23).  The arbitrator's correction of "clerical" errors impacted the probative value of three of the ten items, none of which were among the items the arbitrator termed most persuasive. Nevertheless, on the basis of these corrections, the arbitrator re-considered his finding that the fair market value of pipe in conforming condition at the time and place of acceptance was $1000 per ton, and reduced that fair market value to $950 per ton. (Id.). This was improper reconsideration, in excess of the arbitrator's powers, and it is first branch of this application.

Separately, the arbitrator did make a pure mathematical error that he should have agreed to correct, as it was clearly within his power to correct. The calculation error made by the arbitrator also had a material impact on the damages awarded to Dempsey. The arbitrator's calculation concerned Dempsey's costs to straighten the defective pipe -- whose defect was that it was bowed and bent beyond the deviation from dead straight allowed by the contracts. The arbitrator used this calculation of "repair" costs for two purposes. First, the repair costs were an item of incidental damages awarded to Dempsey (OFA ¶¶ 125-130, 136-138), and the calculation error caused those damages to be understated. (Dempsey Pet. ¶¶ 29-40). Second, the arbitrator treated the straightening costs as a component of the difference between the value of conforming goods and the value of non-conforming goods.  (OFA ¶¶ 131-135).  In calculating repair costs, the arbitrator needed to calculate the number of hours required to straighten all of the defective pipe, and the incremental cost per hour of that work, i.e. the cost in excess of normal processing costs. The arbitrator's material miscalculation of the repair costs – as shown

below – therefore impacted the award of damages to Dempsey in two ways: incidental damages for repair costs were understated by 75%, and the diminished value of the non-conforming pipe was also materially understated. The result was to award diminution-in-value damages to Dempsey that are considerable lower than the amount that would confer the benefit-of-the-bargain on Dempsey – the benefit of the bargain per the arbitrator's own determinations of Dempsey's projected prices, costs, and margins had the goods been conforming goods.

**\*\*\*\***

We now turn to the details.

## C. <u>The Arbitrator's Correction of Ostensible "Clerical" Errors</u>

### (1) <u>The Mis-Read Purchase Order of a Dempsey Competitor</u>

One of Dempsey's competitors, Morris Industries, testified on behalf of T. Co. concerning Morris's resale prices for conforming pipe of the same grade and quality as that contracted for by Dempsey with T. Co. To rebut the potential inference that Morris's relatively low re-sale prices supported a finding of a relatively low fair market value of conforming goods, Dempsey obtained by arbitral subpoena certain purchase orders showing that Morris, like Dempsey, had purchased its supply of pipe from foreign sources at prices significantly below the U.S. mill prices for the same quality of pipe. [3]

---

[3]    The arbitrator found that Dempsey priced its pipe for re-sale at a 25% mark-up over the domestic mill supply price (OFA ¶ 118), and hoped to capture as profit the large difference between the foreign supply price ($780 per ton in the T. Co. contracts) and the domestic mill supply price (initially determined to be $1000 per ton). Dempsey introduced Morris's supply prices as a basis for the arbitrator to infer, as a possible explanation for Morris's relatively low resale prices, that Morris preferred to increase market share with lower prices rather than increase profit margin by capturing the domestic-import differential.

Eight such documents were placed in the record, and they showed that Morris purchased pipe at prices ranging from $700 to $769 per ton. The arbitrator mis-read a price on one of the eight documents, due to handwriting that partially obscured the printed figures. (MJG Decl. Ex. 1).[4] He therefore – according to his account in the Order (Order ¶¶ 27-28) -- misunderstood $769 per ton as $769 per hundred feet, and converted the latter sum to $904 per ton. In the Original Final Award, as a result, the Arbitrator stated that the Morris documents showed purchase prices ranging from $700 to $904 per ton. (OFA ¶ 11). In the Amended Final Award, the Arbitrator corrected the upper limit of the range to $769 per ton. (Order ¶ 30, AFA ¶ 128).

The Arbitrator did make a mistake, but it was not a clerical mistake: he mis-read the data. He did not mis-record what he understood the document to say. The Original Final Award correctly reflected the Arbitrator's mis-interpretation. The error was therefore interpretive, not clerical, and as such it was not correctible under AAA International Rule 30.1.

### (2) **The Correctly-Reported Invoice of HOW Industries for 10-Foot Pipe Sections**

Listed sixth in order of persuasiveness, in the Original Award's listing of evidence concerning the fair market value of conforming pipe at the time and place of acceptance (OFA ¶ 118, Order ¶ 21), was an invoice to a customer of another pipe distributor in Central New York near Syracuse, HOW Industries. (MJG Decl. Ex. 2). In the Original Final Award, the price stated in the invoice was correctly translated to a price per ton (OFA ¶ 118). No reference was

---

[4] References to "MJG Decl." are to the Declaration of Petitioner's Counsel Marc J. Goldstein, which is presented to place relevant evidence before the Court.

made in the Original Final Award to the fact that this transaction was for the resale of 10-foot lengths of pipe, whereas the pipe to be valued was purchased by Dempsey in 20-foot lengths.

T. Co. in its petition to the arbitrator to correct the Award (excerpted at MJG Decl. Ex. 3), pointed out that the arbitrator did not refer to the 10-foot length, and claimed that the arbitrator had made a mistake by not taking into account the price difference between 10-foot and 20-foot pipe. T. Co. argued that evidence of sales of 10-foot sections should be excluded, or discounted, because the price in part reflects additional processing costs to cut in half pipe purchases in standard 20-foot lengths for resale as 10-foot sections.

The arbitrator responded in the Order that the HOW 10-foot pipe sale had been included by mistake, because the arbitrator had intended to exclude such sales from consideration. (Order ¶¶ 39-40). The arbitrator considered this error to be <u>clerical</u> and therefore correctible. In the Amended Final Award, the HOW 10-foot pipe sale was excluded from the arbitrator's list of the evidence considered in determining the fair market value of pipe in conforming condition.

But the error was not clerical. The arbitrator does not assert that a word processor was instructed to delete the item from the evidence list, and failed to execute his instruction in preparing the Original Final Award. The error the arbitrator claims occurred was an observational error, an oversight by the arbitrator in reading the evidence, insofar as he did in

fact fail to observe that the transaction was a sale of 10-foot sections of pipe, and did in fact intend to exclude such sales from any consideration.[5]

### (3) **The HOW and Dempsey Steel Invoices for Resale of "Threaded and Coupled" Pipe**

Also included in the arbitrator's fair value evidence list – as the seventh- and ninth-ranked items in order of persuasive force (Order ¶¶ 21), were invoices for resale of "threaded and coupled" pipe as distinguished from "plain end" pipe. (MJG Decl. Ex. 4). Threading and coupling is a processing service performed by companies like Dempsey for certain of its customers, and the charges for the processing are added into the price. Thus, one of the steps needed to be taken, if evidence of such sales was to be considered as an indicator of the supply price at the time and place of acceptance (i.e. what Dempsey would pay in the market), was to exclude the element of re-sale price related to the processing.

Assuming that the arbitrator indeed wished to disregard re-sale transactions involving threaded and coupled pipe,[6] such that the inclusion of these items in the fair value evidence list was an error, still it was not a clerical error. It was, once more, an observational error by the arbitrator. He failed to assimilate all the data in the invoice. No claim was made by the arbitrator

---

[5]    Nothing in the Original Final Award indicates that the arbitrator's intent was to exclude evidence of resale of 10-foot sections. The HOW invoices showed contemporaneous sales of 10-foot and 20-foot lengths, with a price differential of $1.00 per foot. And so the arbitrator might well have taken into account that differential, in assessing the probative weight of the re-sale price for 10-foot sections.

[6]    T. Co. had urged the arbitrator to make a downward adjustment of the price of $70 per ton, for the cost of threading and coupling, based on the evidence of Dempsey's processing costs. (MJG Decl. Ex. 3 at 12). The arbitrator accepted that Dempsey's processing costs were $70 per ton, but declined to make the adjustment because there was no evidence of HOW's or Dempsey Steel's costs for similar work. (Order ¶ 43). However the $70 per ton processing cost figure, accepted by the arbitrator, proves conclusively the computational error of the arbitrator in regard to Dempsey's repair costs. (Section D, infra).

in the Order that the mistaken inclusion of this evidence in this list resulted from a scrivener's failure to execute his directions. It was simply not the type of error that Article 30.1 permitted the arbitrator to correct.

### (4) The Arbitrator's Re-Determination of the Fair Market Value of Conforming Goods

The arbitrator proceeded to modify his finding on the fair value of conforming goods at the time and place of acceptance. He reduced that sum from $1000 per ton to $950 per ton. In doing so, the arbitrator conceded that the adjustment was subjective and discretionary. (Order ¶¶ 56-58). The impact was to reduce Dempsey's diminution in value damages from $420,537 to $340,587. (Id.).

### D. The Arbitrator's Miscalculation Of Dempsey's Costs To Straighten The Pipe

It is understandable that a mistake could be made in calculating the costs to straighten the pipe, as several constituent facts were involved, and matters were complicated by the way the proceedings on this matter unfolded:

1. The arbitrator accepted Dempsey's evidence that it charged customers at the rate of $125 per hour for processing work such as threading and coupling, or in this unusual case, straightening, pipe. (OFA ¶ 125). The arbitrator found that this price included a profit margin, such that Dempsey's actual cost per hour was $82.50. (Id.).

2. The arbitrator found that Dempsey could only process three pieces of defective pipe per hour on each of its machines, compared to 12 pieces per hour of conforming pipe. (OFA ¶ 127).

3. The arbitrator in his pre-Award submission to the parties stated unequivocally that the understood the $125/hour rate to be the cost to customers for processing 12 pieces of

10

conforming pipe on one machine in one hour. (Dempsey Pet. Ex. 4, section C.1. at 2d bullet point).

4.  The arbitrator found that Dempsey owned four processing machines, and used all four machines, to process the defective pipe. (Id.).

5.  The arbitrator found that each piece of pipe weighed 0.17 tons (OFA ¶ 125), and that the total number of defective tons was 1599 (Id.). This meant there were 9,406 defective pieces (id.), and at 3 pieces per hour on each of four machines, i.e. 12 pieces per hour in total, the straightening work was done in 784 hours (OFA ¶ 128).

6.  The arbitrator then calculated the total costs to straighten the pipe as 784 hours x $82.50 per hour, i.e. $64,680. (Id.).

The error occurred in this last step. $82.50 was the cost per hour for running <u>one</u> machine, not four – as the arbitrator had found based on Dempsey's evidence, in the pre-Award submission (Dempsey Pet. Ex. 4). To calculate the repair costs, the arbitrator should have multiplied $82.50 x 784 hours <u>x 4 machines</u>. The arbitrator's 784 hours calculation was expressly on the premise of four machines running concurrently. (OFA ¶¶ 127-128).

Two weeks before the final oral argument, the arbitrator submitted written questions to the parties, in which he made the calculation correctly. (Dempsey Pet. Ex. 4). At that point, the fact that four machines had been used had not emerged as an issue. The arbitrator asked the parties to comment on his calculation, which used $125 as the cost per hour for one machine (at that point leaving Dempsey's profit margin on processing work in the equation). Dempsey stated at the final oral hearing that the calculation was correct. (MJG Decl. Ex. 5). T. Co. did not dispute these elements of the calculation.

11

T. Co. did dispute, at the final oral hearing, whether in fact the rate of processing was reduced from 12 pieces to 3 pieces per hour. T. Co. pointed out at that time that, for the number of processing hours required to process all of the defective pipe, the work would still not be finished. (MJG Decl. Ex. 6). But T. Co.'s argument assumed that only one machine was used such that actual hours and machine hours were the same. Dempsey responded that four machines were used, such that machine hours equaled actual hours times four, and the arbitrator in the Original Final Award agreed with Dempsey on this point. (OFA ¶ 127).

But the arbitrator, without further inquiry to the parties about whether $82.50 per hour was a rate for running one machine for one hour, or four machines for one hour, implicitly assumed in the Original Final Award implicitly assumed – that is to say, he made a calculation that necessarily assumed, whether or not the arbitrator realized it, and whether or not he realized the he was contradicting the pre-Award submission finding – that $82.50 per hour was Dempsey's cost to run four machines. (OFA ¶ 128). This implicit assumption reduced the repair costs calculation by 75% from what had been indicated in the arbitrator's pre-Award calculation (Dempsey Pet. Ex. 4), which had been confirmed by Dempsey at the final hearing (MJG Decl. Ex. 5).

When Dempsey petitioned the arbitrator to correct the error, the arbitrator declined. He stated that the issue of whether $82.50 per hour covered four machines or one machine per hour had not been clearly presented (Order ¶ 12), and that "there was no evidence on the record that the Dempsey shop rate of $82.50 per hour was a per machine hour price, rather than a per actual hour price" (id) – ignoring his own pre-Award finding and Dempsey's confirmation of it, and overlooking Dempsey Ex. 29 (MJG Decl. Ex. 7) as cited by T. Co. (MJG Decl. Ex. 3 at 12) as proof that Dempsey's processing costs were $70 per ton   The arbitrator then referred to T. Co.'s

12

argument, in opposition to Dempsey's petition, that the evidence showed that most of the processing work had been done at a location where Dempsey had only one processing machine. The arbitrator stated that if he had power to reconsider, he would reconsider and find that T. Co. was correct. (Order ¶13).[7]

Ironically, evidence presented by T. Co. for a different purpose, in the post-Award petition, and accepted by the arbitrator in the Order and Amended Final Award provides a mathematical proof of the arbitrator's calculation error. T. Co. submitted, and the arbitrator agreed, that Dempsey's charges to its customers for processing work, stated in dollars per ton rather than dollars per hour, were on average $70 per ton. But since the arbitrator had found that Dempsey's normal output per hour per machine was 12 pieces weighing .17 tons each (OFA ¶¶ 125, 127) , i.e. 2.04 tons, $70 per ton corresponded to $140 per hour (2 tons per hour x $70 per ton), which in turn confirmed that Dempsey"s normal "shop rate" of $125 per hour must be, as Dempsey said it was, a charge based on the cost to run one machine for one hour, not four machines.   The arbitrator's calculation error is demonstrated on the face of the award, and yet he has declined to address it. He offered no reasoned basis for reversing the pre-Award finding, and no reconciliation of that finding with the contradictory assertion that the matter was not clearly presented and that Dempsey had offered no evidence to support its position. Instead the Original Final Award, the Order, and the Amended Final Award, make no reference to the pre-Award finding, and thus they furnish the disquieting impression of an attempt by the arbitrator to divert attention from a decision he made to consciously embed an error in his calculation in order to reduce dramatically Dempsey's recoverable damages.

---

[7]     Dempsey declined to argue the evidence on this point, since it was clearly improper reconsideration, and Dempsey adheres to that position here.

* * *

The anomalous result of these combined errors by the arbitrator – one in making corrections he could not make, and the other in refusing a correction he could and should have made -- is that the diminution in value formula in Section 2-714(2), whose purpose is to provide the buyer with the benefit of the bargain, i.e., to put the buyer in as good an economic position as full performance would have done, was applied in a way that provided Dempsey with damages far lower than the benefit of the bargain as determined in the Amended Final Award.[8]

## ARGUMENT

### POINT ONE

### IN REDUCING THE AWARD, THE ARBITRATOR EXCEEDED HIS POWERS

"As a general rule, once an arbitration panel decides the submitted issues, it becomes *functus officio* and lacks any further power to act." Ottley v. Schwartzberg, 819 F. 2d 373, 376 (2d Cir. 1987). "When the arbitrator renders his final award, his power under the agreement is exhausted, and, *unless his subsequent attempts to act under the agreement and submission fall within a very few narrow categories. . . They are null and void.*" Salt Lake Pressmen, Local

---

[8] The Arbitrator initially found that Dempsey could have re-sold the pipe, had it been as warranted, for an average price of $1250 per ton (OFA ¶ 118), and thus would have realized a gross profit of $470 per ton, having bought from T. Co. for $780 per ton (OFA ¶ 114).    The arbitrator also found that after straightening the pipe, Dempsey was only able to re-sell the pipe for $922 per ton (OFA ¶ 115), realizing a gross profit of $142 per ton, because its repair efforts could not restore the pipe to its warranted condition or otherwise permit re-sale for a higher price. (Id.).  Thus, Dempsey's benefit of the bargain damages, under the common law, would have been $328 per ton, plus costs of repair. For 1599 defective tons, benefit of the bargain damages before repair costs would be $520,000.  The correction urged in this petition would raise the level of damages to this benefit-of-the-bargain level.

Union 28 v. Newspaper Agency Corp. , 485 F. Supp. 511, 515 (D. Utah 1980) (emphasis supplied).

Three exceptions to the *functus officio* doctrine are recognized: incomplete adjudication, ambiguity, and "*a mistake which is apparent on the face of the Award.*" Colonial Penn Ins. Co. V. Omaha Indem. Co., 943 F.2d 327, 332 (3d Cir. 1991). Only the third-mentioned exception is at issue here – whether there was a mistake apparent on the face of the Award.

The controlling precedent is Hyle v. Doctor's Assocs., Inc., 198 F.2d 368 (2d Cir. 1999). Hyle involved the corrective powers of the arbitrator under AAA Commercial Rule 46, the domestic AAA arbitration counterpart to AAA International Rule 30.1 [9] In Hyle, the arbitrator had, in the original award, mis-identified the one defendant, among four, against whom damages and injunctive relief were afforded. When the misidentification was called to the arbitrator's attention, he issued a corrected award. Implicit in the issuance of the corrected award was that "clerical error" was broad enough to include a judgmental error in mis-identifying the party intended to bear responsibility for damages and injunctive relief.

The District Court denied a motion to vacate the corrected award, and also remanded the matter to the arbitrator for further proceedings consistent with its decision. But the Second Circuit affirmed  only  the  remand.  It  did  not  sustain  the  District Court's judgment refusing to vacate the corrected award. 198 F.2d at 371.  The basis for the

---

[9]  Rule 46 of the AAA Commercial Arbitration Rules contains the same text as ICDR Rule 30.1, but notably adds: "*The arbitrator is not empowered to re-determine the merits of any claim already decided.*" (emphasis supplied).

remand was the "ambiguity exception" to the *functus officio* doctrine – which permits, as does AAA International Rule 30, interpretation or clarification of an award. *Id.* [10]

Hyle is instructive here. If mis-identification of the party responsible for damages is not a clerical error the arbitrator may correct under the AAA correction rules, neither is mis-interpretation of a document or inadvertent inclusion of evidence the arbitrator intended not to consider. Further, under Hyle, before a remand for clarification of an ambiguity will be permitted, there must be error evident on the face of the award or from other objectively-verifiable sources in the arbitration record. 198 F.3d at 371.

Applying these principles here leads to the conclusion that there were no clerical errors and that the Arbitrator exceeded the corrective powers conferred by Article 30.1 by correcting non-clerical errors[11] in interpretation of evidence:

---

[10] Judge Newman wrote for the Court: "We analyze the problem somewhat differently than do the parties and the District Court. We think the wording of the award, read in conjunction with the undisputed limitation announced by DAI as to the respondent against whom it was seeking damages and an injunction, creates an ambiguity as to whether the arbitrator intended to award damages and an injunction against Gruelich, Hyle, or possibly even all four respondents." 198 F.2d at 371.

[11] The notion of clerical error by negligent omission, rather than by mis-transcription, is at odds with the plain meaning of "clerical error" in a variety of contexts. Webster' Revised Unabridged Dictionary defines clerical error as "any error made in copying or writing." BusinessDictionary.com refers to "inadvertent negligence in...recording or copying a fact or statement. " Black's Law Dictionary refers to "a mistake in writing or copying". Numerous legal authorities have referred to clerical error as mistake in transcription. *See, e.g.*, Ammons v County of Wake, 119 NC App 426 (96-574), Sept. 16,1997 (fn decision reported on-line at www.aoc.state.nc.us/www/public/coa/opinions/19977/96074-1.htm), Keybank Natl Assn v. Michael, 770 N. E. 2d 369, 375 (Ind. Ct. App. 2002) ("mistake by a clerk, counsel, judge, or printer that is not the result of judicial function and (that) cannot reasonably be attributed to the exercise of judicial consideration or discretion"); Collins Entertainment Corp. v. Columbia "20" Truck Stop, Inc. (South Carolina Ct App 1999) (www.judicial.sc.us/opinions/HTML files/COA/2954.htm) (same); 14 *Corpus Juris Secundum* at p. 1202: "mistake in copying or writing; mistake which naturally excludes any idea that its insertion was made in the exercise of any judgment or discretion, or in pursuance of any determination....".

1. With regard to the HOW July 16, 2005 invoice for ten-foot sections of pipe (MJG Decl. Ex. 2), the Original Award on its face does not reveal whether, or how, the Arbitrator took into account the variation in length. From the mention of the invoice in the Award, it is entirely possible that the Arbitrator correctly appreciated that the invoice was for ten-foot pipe sections, and incorporated the variance into his assessment. Under Hyle, this is not a correctible clerical error under Rule 30.1 because it is not objectively evident on the face of the Award.

2. With regard to the HOW and Dempsey Steel Pipe invoices, for "threaded and coupled" pipe (MJG Decl. Ex. 4), they are not mis-identified as "plain end" pipe in the Original Award. It is entirely possible, based only on what the Award states, that the Arbitrator in his assessment, took into account the "threaded and coupled"/"plain end" distinction. To determine if there was error required reference not only to the record, but to the reasoning processes and intentions of the Arbitrator that were not fully expressed in the Award. Under Hyle, this is not clerical error capable of correction by the Arbitrator under the ICDR Rule 30.1.

3. The Arbitrator's correction of his mis-reading of one price entry on a Morris Industries purchase order (MJG Decl. Ex. 1), equally, cannot be considered as clerical, because determination that there was error requires resort to evidence extrinsic – the invoice itself, and the Arbitrator's explanation as to how his mis-reading came about. This takes the mistake out of the realm of correctible clerical error under ICDR Rule 30.1.

Hyle's restrictive approach means that some obvious judgmental and interpretive errors by arbitrators will not be readily correctible. Whether such a restrictive approach to arbitral

mistakes is good law or good policy is not the issue here. This Court cannot legislate for the AAA.

Respected commentators have called upon arbitral institutions such as the ICDR/AAA to make provision in their rules for the correction of award errors that are non-clerical in nature. *See, e.g.*, H. Smit, *Correcting Arbitral Mistakes*, 10 Am. Rev. Int'l Arb. 225 (1999). But to date the institutions have not taken such action.

Professor Hans Smit, a leading international arbitrator and arbitration scholar, in a commentary prompted by Hyle, urged arbitral institutions to adopt an expanded rule permitting correction of "*mistakes or uncertainties that are clear on the face of the award, from the record of the proceedings, or from subsequent developments.*" 10 Am. Rev. Int'l Arb. at 227. So far the AAA has not heeded this call. *See also*, J. Gaitis, *International and Domestic Arbitration Procedure: The Need for A Rule Providing a Limited Opportunity for Arbitral Reconsideration of Reasoned Awards*, 15 Am. Rev. Int'l Arb. 9 (2004) ("*[N]one of the most widely utilized rules have. . .[been] amended to provide for a formal procedure that would allow a party to request an arbitral tribunal to correct an unintended error in the actual 'reasoning' of a reasoned arbitration award even when it is clear that the tribunal erroneously interpreted objective evidence. . . .*"); H. Smit, *Another Judicial Misstep in Correcting an Arbitral Award*, 12 Am. Rev. Int'l Arb. 435, 436 (2001) ("A most persuasive argument can therefore be made for granting the arbitral tribunal, within a reasonable time after rendition of the award, . . .the authority to make any correction it deems appropriate").

The result that must follow here cannot be in doubt. As the Arbitrator was without power to correct the non-clerical interpretive errors that were corrected, it necessarily follows that he

was without power to translate those corrections into a revised evaluative determination on an ultimate issue, i.e. the value of the pipe as warranted.

Further, even if one or more of those individual adjustments had been permissible as "clerical" corrections, the revised determination of fair market value was impermissible. It was reconsideration pure and simple. The Arbitrator stated that it is "*to be understood that an arbitrator is empowered to change conclusions based upon clerical errors in the body of an award, even where such correction process entails an exercise of judgment beyond rote computation.*" (Order ¶ 57). But even if "rote computation" is not the test, the rule should not be that all clerical errors re-open awards to subjective reconsideration, however attenuated the connection between the corrections and re-assessment. These clerical errors did not cast serious doubt on the $1000 per ton conclusion. That original conclusion did not depend significantly on $904 per ton as the upper limit of the range of Morris supply prices.  Nor did it depend significantly on the supply prices inferable from the HOW and Dempsey Steel Pipe invoices. By the arbitrator's own statement, the most probative evidence consisted of the prices indicated by the price announcements of the domestic mill, Wheatland Tube.  (Order ¶¶ 21, 23). Those announcements indicated prices during the relevant period starting at $1028 per ton and rising twice in $65 per ton increments to $1158 per ton.  Thus the arbitrator's initial determination of $1000 reflected a discounting of the value indicated by the Wheatland Tube evidence, even though some of the evidence showed that Wheatland sold for prices well in excess of the price announcement prices. (OFA ¶ 128).  It simply cannot be said that an additional $50 per ton discount, as compared to the Wheatland Tube price announcements, was logically necessary to prevent the Original Award from being irrational and inadequately supported by the record.

One of the leading commentators advocating rule expansion makes a clear distinction between objective errors and matters of judgment, urging that a strict line be drawn to bar arbitrators from correcting matters involving subjective assessment. J. Gaitis, *supra, The Need For a Rule. . .*, 12 Am Rev. Intl. Arb. 9 at n. 18 ("[A] rule that narrowly limits the opportunity for arbitral reconsideration to errors relating to objective matters best ensures that any modification of the award is consistent with the spirit and intent of the award that was originally written and, further, that the tribunal is not tempted to reopen the record on rehearing").

**POINT TWO**

**THE ARBITRATOR MADE AN EVIDENT MATERIAL MISCALCULATION OF DEMPSEY'S PROCESSING COSTS FOR THE DEFECTIVE PIPE**

The Arbitrator's miscalculation of Dempsey's costs to process the defective pipe, which was carried through by further computations (not judgments) to his ultimate conclusion on diminution-in-value damages, stands on a different legal footing that his correction of purported "clerical" errors.  It is an *"evident material miscalculation of figures,"* that may be corrected by the Court (9 U.S.C. § 11(a)). Here, the miscalculation in the Amended Final Award is based upon a material error by the Arbitrator in determining an unambiguous, uncontested fact:   that Dempsey's "shop rate" for processing pipe, $125 per hour, pertained to the hourly output not of four processing machines, but of one as the arbitrator had initially found (Dempsey Pet. Ex. 4)

An evident material miscalculation may be found, and the calculation may be corrected, not only where the arbitrator simply made a mechanical error in computation, but also where the record reveals that the calculation was premised on a clearly erroneous assumption of fact, that is "where the record that was before the arbitrator demonstrates an unambiguous and undisputed

20

mistake of fact and the record demonstrates strong reliance on that mistake by the arbitrator in making his award." Valentine Sugars, Inc. v. Donau Corp., 981 F.2d 210, 214 (5th Cir. 1993). *See* National Post Office v. U.S. Postal Service, 751 F.2d 834, 843 (6th Cir. 1985); United Parcel Service, Inc. v. Intl Bhd. Of Teamsters, 999 F. Supp. 70, 76 (D.D.C. 1998); Cordis Corp. v. C.R. Bard, Inc. , 1993 U.S. Dist. LEXIS 20445 at *17 (S.D. Tex. Mar. 10, 1993). This is clearly the case in regard to the Amended Final Award, which unlike the Original Final Award is based upon the explicit finding of fact, in the Order, that Dempsey's $125/hour shop rate was its charge to customers (cost plus profit margin) to process 48 pieces of pipe per hour on four machines.

Stated differently, in the words of the First Circuit, "where the 'fact' underlying an arbitrator's decision is concededly a non-fact and where the parties cannot fairly be charged with the misapprehension, the award cannot stand." Electronics Corp. of America v. Intl Union of Electrical, Radio and Machine Workers, Local 272, 492 F.2d 1255, 1257 (1st Cir. 1974). *Accord,* North Adams Regional Hospital v. Massachusetts Nurses Ass'n, 74 F.3d 346,348 (1st Cir. 1996); Tirra Mollison-Turner v. Lynch Auto Group, 2002 U.S. Dist. LEXIS 9491 at *8 (N.D. Ill. May 23, 2002).   The "fact" on which the calculation of repair costs was based -- that the $125/hour shop rate was based on an hourly cost of $82.50 to run four machines – was clearly a non-fact because the evidence demonstrated  irrefutably that the $82.50 hour cost could not possibly be the cost of running more than one machine.

The record before the Arbitrator demonstrated without ambiguity that the Dempsey "shop rate" of $125/hour was a rate for one machine that could process 12 pieces of non-defective pipe per hour. The Arbitrator clearly understood Patrick Dempsey's written testimony to state that "*Dempsey normally processes 12 pipes an hour, at a cost of $125/hour.*" (Dempsey Pet. Ex. 4 at C. 1 bullet 2). The Arbitrator so stated in his Pre-Award Submission on March 8, 2007, eleven

days before the final oral hearing. Neither party disputed that this was Dempsey's normal rate of production, and Dempsey's normal hourly charge for processing. And so when the Arbitrator made his tentative finding on March 8, reflecting his understanding that the $125/hour rate was the rate for 12 pipes an hour on one machine, and when Dempsey confirmed and T. Co. took issue with that finding at the Final Hearing, Dempsey justifiably assumed that this fact had been established. But then, despite the arbitrator's evident acceptance of Dempsey's evidence and the absence of any dispute concerning that evidence, the arbitrator implicitly held that Dempsey processes 48 pieces per hour, not 12, at a cost to its customers of $125/hour.

T. Co., in its own petition to correct the Award, pointed out that Dempsey's sales records in evidence indicated processing charges of $70/ton. (MJG Decl. Ex. 3 at 12). T. Co. made that argument for a different purpose, i.e. to support its argument that in considering the the HOW and Dempsey Steel Pipe invoices for threaded and coupled pipe as evidence of the market value of Subject Pipe as warranted, the Arbitrator deduct the component of the price that was a variable charge for processing. The Arbitrator accepted T. Co.'s contention that Dempsey's processing charge was $70/ton, but declined to extrapolate Dempsey's charges to other companies' prices. (Order ¶ 43). But the Arbitrator failed to recognize – and T. Co. understandably did not point out -- that this same evidence <u>irrefutably</u> confirmed that the $125/hour rate had to be for one machine's hourly output, not four. This was so for a very simple reason: the Arbitrator had found as a fact that one Dempsey machine could process two tons of non-defective pipe per hour. (OFA ¶ 127, two tons per hour being the product of 12 pieces per hour and .17 tons per piece). At $70/ton, $140/hour would represent the charge for

two tons processed on one machine in one hour. [12]  Had Dempsey's shop rate of $125/hour

pertained to the output of all four machines, i.e. eight tons, it sales records should corroborate

processing charges to customers at the rate of $15.63/ton ($125/8).  The sales records clearly do

not support such charges. (MJG Decl. Ex. 7).

The Arbitrator, while accepting T. Co.'s view of Dempsey' evidence of its processing

costs at $70/ton, either did not realize – or chose to ignore -- the fact that the $70/ton charge for

processing was irrefutable proof that Dempsey's "shop rate" of $125/hour could only refer to the

output of one machine. [13]

Thus, "the record that was before the arbitrator demonstrates an unambiguous and

undisputed mistake of fact."  That the calculations of processing costs, damages for incremental

---

[12] T. Co.'s submission was unclear as to how it calculated $70/ton. But one example from
the evidence  (MJG Decl. Ex. 6, pages 6 and 10) is sufficiently corroborative. On August 5,
2005, Dempsey sold "plain end" pipe to a customer for $7.80 per foot, and "threaded and
coupled" pipe to the same customer for $8.35 per foot.  The difference, $0.55 per foot, when
converted to dollars per ton at the conversion rates adopted by the Arbitrator, is <u>$64.70 per ton</u>
($0.55 per foot/17 pounds per foot x 2000 pounds per short ton) That means a charge of $129.40
would apply for two tons, i.e. for the normal hourly output of one machine.

[13] The Arbitrator's states in paragraph 13 of the Order that he found T. Co.'s "new" argument
that 80 percent of the processing was done on one machine at the New Hampshire location to be
persuasive – and that while he was not empowered to reconsider, he would have found that
argument persuasive had it been made pre-Award.  But in fact the argument was not new; it had
been clearly stated by T. Co. at the final oral hearing (MJG Decl. Ex. 8), and the Arbitrator had
rejected it, in finding that four machines were used.  As the Arbitrator had no power to
reconsider, the entire discussion in this paragraph is troublesome.  It suggests the Arbitrator
lacked confidence in his altered finding – made explicit only in the Order, not in the Original
Award -- that $125/hour was a rate for four machines, and was eager to justify the result on the
basis that an alternative ground for an even less favorable result to Dempsey existed.  We also
note that in the Award the Arbitrator refers to <u>Dempsey's contention</u> that processing costs were
$421,375. (  OFA ¶ 136, AFA ¶ 136). This was in fact Dempsey's corroboration at the final oral
hearing (MJG Decl. Ex. 5) of the <u>Arbitrator's calculation</u> of $421,375 in the Pre-Award
Submission (Dempsey Pet. Ex. 4), which calculation had been based on a 100% defect rate and
the Arbitrator's original and correct determination that the $125/hour rate was for the hourly
output of one machine (three defective pieces).

processing costs as incidental damages, and diminution of value damages under UCC 2-714 (2)

all were materially affected by the miscalculation is evident on the face of the Amended Final

Award. The Arbitrator's calculation of processing costs was:

> 9406 defective pieces of pipe @ 12 defective pieces per hour (on four machines) = 784 hours x $82.50 per hour (to run four machines) = $64,680. (AFA ¶ 139).

Had the fact that the "shop rate" was for one hour on one machine been found correctly,

the calculation of processing costs would have been (in parallel to what it had been in the Pre-

Award Submission[14]):

> 9406 defective pieces of pipe @12 defective pieces per hour (on four machines) = 784 hours x $82.50 per hour per machine x 4 machines = $258,720.

The resulting impact on the Amended Final Award is reflected in Exhibit 5 to the

Petition. Dempsey's processing costs incidental damages should have been $194,040, not

$48,513, and its diminution of value damages should have been $519,675, a total increase in

diminution of value damages of $ 99,138 from the amount awarded in the Original Final Award,

or 23.6 %. The amounts involved are clearly "material" under Section 11(a) of the FAA.

---

[14] The calculation in the Pre-Award Submission was based on an assumed 70% defect rate: 9477.4 defective pieces @ 3 defective pieces per hour (on one machine) = 3,159.1 hours x $125/ hour = $394,892.20. At the time of the Final Award, the total tonnage claimed to be defective by Dempsey had been revised to 1999 from 2090. The Arbitrator found an 80 percent defect rate (thus 1599 defective tons); and the Arbitrator eliminated profit margin from the $125/hour rate, reducing it to $82.50. Thus, the corrected result Dempsey seeks here is conceptually in parallel to the Arbitrator's calculation in the Pre-Award Submission.

**POINT THREE**

**THE ARBITRATOR DID NOT MANIFESTLY DISREGARD THE LAW**

T. Co.'s contention that the arbitrator's award of diminution in value damages should be vacated on grounds of "manifest disregard of the law" is meritless. The "law" that the arbitrator is said to have disregarded is a sentence in the Sales Contracts: "Seller is not responsible for consequential loss or damage." (Kuffler Decl. Ex. A, 3d and 5th pages). That is not law; it is a provision in a contract. The arbitrator's mandate was to interpret the contract. The contract had no definition of "consequential loss or damage." T. Co. did not cite to the arbitrator, and does not cite here, any case law giving such terms a monolithic meaning, such that in all cases "consequential loss or damage" when excluded, prohibits an award of diminution-of-value damages under UCC 2-714(2) to a buyer who accepts non-conforming goods.

The text of UCC 2-714 contradicts T. Co.'s position. Section 2-714(2), the diminution in value formula applied by the arbitrator, and quoted by T. Co. at page 7 of its brief, is followed by Section 2-714(3), to which T. Co. does not refer: "*In a proper case any incidental or consequential damages under the next section may also be recovered.*" (emphasis supplied). Evidently, the Code regards diminution-in-value damages under § 2-714(2) as being different from consequential damages, so that the latter may be recovered in addition to the former, absent a contractual exclusion. Thus, even if consequential damages are commonly understood to include the lost operating profits of a business, the arbitrator was on firm ground in concluding that diminution in value damages are awardable even where consequential damages are excluded – particularly where, as here, consequential damages are not more specifically defined in the contract, such that the contract is open to interpretation by the arbitrator.

While T. Co. cites here, and cited to the arbitrator, case law referring to lost profits as a common species of consequential damages, it cited no controlling authority requiring the arbitrator to treat diminution-of-value damages under 2-714(2) as lost profits, or diminution-of-value damages as consequential damages, even in a case where the buyer's counsel has characterized the claim as a lost profits claim. Having cited no such clear, controlling authority to the arbitrator, T. Co. cannot possibly show that the arbitrator understood the controlling nature of such authority and nevertheless ignored it. Accordingly, T. Co.'s petition must fail.    The Porzig case in the Second Circuit is a notably rare instance of success in attacking an arbitration award on manifest disregard of the law, and while the decision enables T. Co. to point out that on rare occasion those who rely on the doctrine may prevail, Porzig also reaffirms stringent legal standards that are, for T. Co., insurmountable:

> This Court has repeatedly recognized the strong deference appropriately due arbitral awards and the arbitral process. . . . Our review under the doctrine of manifest disregard of the law is highly deferential and such relief is appropriately rare. . . . An arbitral award may be vacated for manifest disregard only where a petitioner can demonstrate both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case.

Porzig v. Dresdner, Kleinwort, Benson, North America LLC, 497 F.3d 133, 139 (2d Cir. 2007) (internal citations and quotation marks omitted).    T. Co. simply cannot prevail under this standard, as they cannot show that the arbitrator knew of controlling legal authority governing the question presented, and refused to apply it or ignored it.

## **CONCLUSION**

These petitions call upon the Court to make a refined assessment of the proper judicial role in reviewing what was obviously a complex, technical commercial arbitration determination. But Dempsey's petition calls upon the Court to uphold the integrity of the arbitral process, not to interfere with it. We call upon the Court to overrule the arbitrator's attempt to treat non-clerical errors as clerical, and to create by fiat arbitral powers to make subjective judgmental corrections to awards, when institutional rules and applicable law simply do not permit this. In addition, we call upon the Court to correct a calculation error that the arbitrator has evidently made with deliberation (having once made the calculation correctly), and has then sought to defend by referring to an alternative ground for a less favorable result for Dempsey, rather than by proof that his changed calculation was correct. As the case law we cite teaches, when arbitration determines rights erroneously based upon demonstrable non-facts, particularly objective non-facts as to quantum that fall in the category of computation matters, it ceases to deserve the deference traditionally accorded it by the courts. T. Co.'s application, on the other hand, reaches well beyond the stringent limitations of the manifest disregard of the law doctrine, and is not worthy of serious consideration.

Accordingly, Dempsey's petition should be granted and T. Co.'s petition should be denied.

Dated: New York, New York

    October 23, 2007

Respectfully submitted,

MARC J. GOLDSTEIN LAW OFFICES

AND ARBITRATION CHAMBERS

By: _Marc J. Goldstein_

    Marc J. Goldstein (MG-8701)

1230 Avenue of the Americas, 7th Floor

New York, New York 10020

(212) 799-8605

Attorney for Dempsey Pipe & Supply, Inc.